**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| APEX COMPOUNDING PHARMACY LLC, | | |
| Plaintiff, | | |
| v. | | CAUSE NO.: 2:16-CV-73-TLS |
| BEST TRANSPORTATION SERVICES, INC., | | |
| Defendant. | | |

**OPINION AND ORDER**

Sometime prior to July 17, 2015, the Plaintiff, Apex Compounding Pharmacy LLC, sought delivery services from the Defendant, Best Transportation Services, Inc. The parties entered into a contract, under which the Defendant would deliver medications manufactured by the Plaintiff to its customers in the Chicago metropolitan area. The Plaintiff alleges that on July 17, 2015, it was notified that the Defendant's delivery person, Katherine Rodriguez, failed to complete eight deliveries. After this discovery, the Plaintiff sued the Defendant in Indiana state court. *See* State Court Compl., ECF No. 3. The Plaintiff's Complaint asserts breach of contract, negligence, and respondeat superior claims against the Defendant. The Defendant contends that Indiana law prohibits all but the Plaintiff's breach of contract claim and that the Plaintiff's recovery for such a claim is limited to, as per the terms and conditions of service agreed upon by both parties, $800.00. This lawsuit was removed to federal court based on diversity jurisdiction, *see* Notice of Removal, ECF No. 1, and the parties then proceeded to trial without a jury, *see* Bench Trial, ECF Nos. 108, 109. Pursuant to Federal Rule of Civil Procedure 52(a), after

observation of the witnesses at trial and review of the trial exhibits, the Court enters the following written findings of facts and conclusions of law.

## FINDINGS OF FACT

Prior to the Bench Trial, the following undisputed material facts were established:

> Best operates a for-hire delivery service that is registered with the United States Department of Transportation. Apex manufactures and sells specialized prescription medication. Apex had an agreement with eight customers to deliver prescriptions for medication to them. Apex engaged Best to pick up the prescriptions at Apex's location in Dyer, Indiana, and deliver them to the customers in Chicago and various Illinois suburbs of Chicago, namely: Lansing, Oak Lawn, Park Forest, and Crete. Katherine Rodriguez, an agent for Best, picked up the prescriptions.

Aug. 20, 2018 Op. & Order 1, ECF No. 75. At trial, the Court heard testimony from the following witnesses:

- Cassi Hammar, assistant office manager at Apex Compounding Pharmacy, LLC;

- Denita Wuske, account executive/business development manager at Best Transportation Services, Inc.;

- Brett Dines, founder of Apex Compounding Pharmacy, LLC;

- Benjamin Kuehl, senior systems analyst at Best Transportation Services, Inc.;

- Daniel Meehan, president and chief executive officer of Best Transportation Services, Inc.

The following facts are based on admitted exhibits and from testimony elicited at trial.

The Plaintiff submitted orders through the Defendant's online portal seeking delivery services for the eight medications that are at issue in the instant case. Tr. Ex. 6. The Plaintiff submitted a valuation of $100.00 for six of the medications and no valuation, which appears as a valuation of $0.00, for two of the medications. Tr. v.2, p. 285, ECF No.112; Tr. Ex. 6. The Defendant engaged Katherine Rodriguez to deliver the medications at issue. Aug. 20, 2018 Op. & Order 1. On July 17, 2015, Katherine Rodriguez failed to deliver the medications. *See, e.g.*,

Tr. v.1, p. 38–39, 50–53, 76–77, ECF No. 111. The medications were not returned to and could not be recovered by either the Plaintiff or the Defendant. The week following July 17, 2015, the Plaintiff remanufactured the medications, and the Defendant delivered them to the Plaintiff's clients. Tr. Ex. 10.

The Plaintiff contends that Katherine Rodriguez was the Defendant's employee; however, the Defendant argues that she was an independent contractor. The following was established about the Defendant's and industry practices:

- The Defendant's delivery persons were staffed by a third-party company, Contract Resource Services (Tr. v.1, p. 107–08; Tr. v.2, p. 313);

- Contract Resource Services compensated the Defendant's delivery persons, provided the delivery persons' health insurance and tax documentation, and conducted background checks and drug tests on the delivery persons (Tr. v.2, p. 313–314, 346);

- The Defendant's delivery persons were required to use their own vehicles and provide their own vehicle insurance (Tr. v.1, p. 108; Tr. v.2, p. 315);

- The Defendant leased a handheld device to some delivery persons (Tr. v.2, p. 341);

- The Defendant's delivery persons could use their own smartphone instead of leasing a handheld device (*Id.*);

- The Defendant leased software to its delivery persons, which could be used on their handheld device or smartphone to manage delivery jobs (*Id.* at 340–42);

- Although not required for every job, the Defendant's delivery persons could provide their own uniform or lease a uniform from a third-party provider (*Id.* at 317, 361);

- The Defendant's delivery persons were required to pay their own expenses, such as vehicle maintenance expenses and toll payments (Tr. v.1, p. 109);

- The Defendant's delivery persons accepted jobs by calling the Defendant or through the leased software, and were permitted to accept as many or as few delivery jobs as they desired (Tr. v.2, p. 315, 340–42);

- The Defendant's delivery persons were not required to accept a certain number of delivery jobs per week and they were free to stop accepting delivery jobs at any time (*Id.* at 312–13);

- The Defendant's delivery persons were free to maintain other employment, including with the Defendant's direct competitors (*Id.*);

- The Defendant's delivery persons were not on its payroll; rather the Defendant paid Contract Resource Services on an invoice for services rendered (*Id.* at 313);

- The Defendant provided an identification badge to its delivery persons (*Id.* at p. 316);

- The Defendant provided some level of training and instruction to its delivery persons, and the training and instructions were based on client demands (*Id.* at 315–16, 324, 338, 349–50);

- The Defendant maintained a dispatch department that was used to communicate with its clients and delivery persons and confirm when shipments were picked up from the client and delivered to the client's customer (Tr. v.1, p 34, 37, 47, 78–79, 84, 110; Tr. v.2, p. 338–39, 351–52);

- The Defendant's dispatch department could be contacted by a delivery person if the delivery person experienced issues while completing their deliveries (Tr. v.1, p 34, 37, 78–79, 84, 110; Tr. v.2, p. 338–39, 351–52);

- The software used by the Defendant provided its delivery persons with a delivery route generated by the client's orders that could be accepted or declined by the delivery person (Tr. v.2, p. 359–60);

- The Defendant's delivery persons used standard forms for each job, including a driver manifest sheet and ticket book, which contained the Defendant's terms and conditions of service (*Id.* at 265, 269–70, 276, Tr. Exs. A, B.);

- The Defendant's clients submitted orders by telephone or by using an online portal (Tr. v.2, p. 276, 309);

- To use the Defendant's online portal, clients were required to set up an account and agree to the Defendant's terms and conditions of service (Tr. v.2, p. 276–77, 380);

- The Defendant's terms and conditions of services provided that "unless otherwise specifically indicated the value of no total shipment or no single piece, package, parcel or article in this delivery, including the contents thereof, exceeds, $100.00 upon which declaration the charge for delivery is based. Any claim in excess of the said $100.00 is hereby released and discharged." (Tr. Exs. A, B);

- It is standard practice in the shipping and delivery industry for customers to declare the value of the item(s) they are shipping so the price of shipping services and the necessary amount of insurance can be determined (Tr. v.1, p. 64; Tr. v.2, p. 287, 299–300, 306–11, 334).

4

Despite the above detailed practices being established by witness testimony and trial exhibits, some details are absent from the record. Regarding the Defendant's practices, it is unclear whether its delivery persons were required to maintain constant communication with the dispatch department (as opposed to simply confirming receipt and delivery of a package) and whether the Plaintiff required the Defendant's delivery persons to receive specialized training before they were staffed on the Plaintiff's delivery jobs. Furthermore, the record is lacking in facts and details particularized toward Katherine Rodriguez's tenure as a Best delivery person. Specifically, no evidence was introduced indicating how long she worked for or how many deliveries she made for the Defendant, whether she leased a uniform or a handheld device, whether she received any training, or whether she used the route generated by her leased software. Evidence was introduced indicating that Katherine Rodriguez contacted the dispatch department on July 17, 2015; however, this communication occurred only after she experienced difficulties during her delivery job. *See* Tr. v.1, p. 79.

## ANALYSIS

The Pre-Trial Order [ECF No. 105] presented the following issues for trial:

1. The actions of non-party Katherine Rodriguez;

2. The relationship between the Defendant and non-party Katherine Rodriguez;

3. Whether fraud had been perpetrated by the Defendant upon Plaintiff which caused damages to the Plaintiff;

4. The responsibility of the Defendant for actions alleged in this matter;

5. The contractual requirements and limitation related to the Plaintiff's request for services from the Defendant; and

6. The recoverable damages of the Plaintiff, if any.

Pre-Trial Order 1–2, ECF No. 105. The Plaintiff's Amended Complaint [ECF No. 19] alleges the following claims against the Defendant: Breach of Contract (Count VI), Gross Negligence

(Count I), and Respondeat Superior (Counts III, V, VIII). Am. Compl., ECF No. 19. The Court will address each count alleged against the Defendant contained within the Plaintiff's Amended Complaint [ECF No. 19] and, in the process, will resolve each issue presented in the Pre-Trial Order [ECF No. 105].

## A.      Breach of Contract Claim

Count VI of the Amended Complaint alleges a breach of contract claim. Whether there was a contract between the parties was not a significant focus of the trial. In fact, the parties seem to agree that some form of contract existed between them. Regardless, the Court must spend some time properly framing the issue, as the evidence introduced at trial suggests that the parties entered into several contracts during the course of their business relationship.

"The required elements to form a valid contract in Indiana are an offer, an acceptance, consideration, and a manifestation of mutual assent." *Hampton v. ITT Commc'ns Sys. Div.*, 1:10-CV-291, 2012 WL 2064510, at *3 (N.D. Ind. June 7, 2012) (citing *In re Paternity of M.F.*, 938 N.E.2d 1256, 1259 (Ind. Ct. App. 2010)).[1] Both parties presented evidence demonstrating that there was a meeting between the Plaintiff's and the Defendant's representatives at which the parties, through their representatives, explored the possibility of entering into a business relationship. *See, e.g.*, Tr. v.1, p 19–21; Tr. v.2, p. 301–06, 323. Both parties also presented evidence showing that sometime after that initial meeting, the parties agreed that the Defendant would begin delivering prescriptions to the Plaintiff's customers in the Chicagoland area. *See,*

---

[1] It is well established that "[a] Federal District Court exercising diversity jurisdiction must apply the substantive law of the State in which it sits." *Bateman v. Cent. Foundry Div., Gen. Motors Corp.*, 822 F. Supp. 556, 561 (S.D. Ind. 1992) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2712 (1983)). Neither party has argued that any law other than Indiana law should apply; thus the Court will apply Indiana law. *See Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009) (citing *Wood v. Mid–Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991)).

*e.g.*, Tr. v.1, p 24; Tr. v.2, p. 304–06. Although the parties may consider this the beginning of their business relationship, this conduct did not result in the formation of a contract.

"The existence of a valid Indiana contract depends on mutuality of obligation." *See Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 759 (7th Cir. 2001). When the parties initially agreed to do business together, the parties agreed that the Plaintiff would submit online order forms to utilize the Defendant's services. The Plaintiff was under no obligation to submit order forms and the Plaintiff routinely used other companies' delivery services. *See* Tr. v.1, p 24. As such, no contract was formed at that time. *Penn*, 269 F.3d at 759. ("[A] contract is unenforceable if it fails to obligate [one party] to do anything." (quoting *Ind.-Am. Water Co. v. Town of Seelyville*, 698 N.E.2d 1255, 1260 (Ind. Ct. App. 1998))).

Rather than a single contract that encompasses the entire business relationship, eight contracts are at issue. Under Indiana law, "[t]he elements of a breach of contract action are the existence of a contract, the breach thereof, and damages." *Hawa v. Moore*, 947 N.E.2d 421, 426 (Ind. Ct. App. 2011) (citing *McKeighen v. Daviess Cnty. Fair Bd.*, 918 N.E.2d 717, 721 (Ind. Ct. App. 2009)). The Defendant does not argue that there were no contracts and to do so would be futile. The Plaintiff, by submitting the eight order forms, extended each time an offer to the Defendant to utilize its delivery services in exchange for payment. The Defendant accepted each of the eight offers, which is made evident by the Defendant sending Katherine Rodriguez to pick up and deliver the Plaintiff's products. Both parties provided consideration, as the Defendant performed a service and the Plaintiff awarded compensation. Finally, mutual assent existed between the parties as it was well established that the Defendant would deliver the Plaintiff's products to its Chicagoland customers in in exchange for payment.

During trial, the Plaintiff's witnesses each testified at length about how the Defendant's delivery person failed to deliver the eight prescriptions. *See, e.g.*, Tr. v.1, p 38–40, 76–79, 143–

45. Although the Defendant's CEO did not affirmatively testify that the Defendant breached the contracts, his testimony does not suggest that the Defendant actually delivered the medications on July 17, 2015, as agreed to in the contracts. Furthermore, it seems unlikely that Denita Wuske's notes investigating the lost prescriptions and the July 20, 2015 orders would exist if the prescriptions had been delivered pursuant to the contracts. *See* Tr. Exs. 9, 10. While testimony from Katherine Rodriguez or the dispatch operator working on July 20, 2015, would have streamlined the Court's analysis, the evidence presented at trial is sufficient for the Court to find in the Plaintiff's favor on its breach of contract claim.

**B. Negligence Claim**

Count I of the Complaint alleges a gross negligence claim against the Defendant on the basis that "Best Transportation and Katherine Rodriguez failed to make the deliveries on behalf of Apex," that "Best Transportation did not supervise or monitor Katherine Rodriguez's conduct as an employee of Best Transportation," that ,"[b]y failing to adequately supervise Katherine Rodriguez, Best Transportation acted in reckless disregard of the consequences to Apex," and that, "[a]s a direct result of Best Transportation's gross negligence, Apex suffered damages in excess of $46,000.00." Am Compl. ¶¶ 12, 14–16. In closing arguments, the Defendant argued that there is no basis for a negligence claim because the only relationship that existed between the parties was a contractual relationship.

The Defendant's argument has merit under Indiana law. To succeed on a gross negligence claim, a plaintiff must show that the defendant owed the plaintiff a duty, that the defendant breached that duty, and that the plaintiff suffered an injury proximately caused by that breach of duty. *Lake Ridge New Tech Schs. v. Bank of N.Y. Mellon, Tr. Co., N.A.*, 353 F. Supp. 3d 745, 757 (N.D. Ind. 2018) (citing *Jaffri v. JPMorgan Chase Bank, N.A.*, 26 N.E.3d 635, 638 (Ind. Ct. App. 2015). "Indiana law does not recognize a tort claim for breach of contract, nor

8

does it allow parties to circumvent that rule by repackaging a breach of contract as a tort." *Forest River Mfg., LLC v. Lexmark Enter. Software, LLC*, No. 3:16-CV-449, 2017 WL 1906164, at *2 (N.D. Ind. May 9, 2017) (citing *Greg Allen Constr. Co., Inc. v. Estelle*, 798 N.E.2d 171, 173 (Ind. 2003); *Bayview Loan Servicing, LLC v. Golden Foods, Inc.*, 59 N.E.3d 1056, 1068 (Ind. Ct. App. 2016)). Accordingly, a plaintiff who claims that the defendant negligently breached a contract has not set forth an actionable negligence claim and cannot succeed. *Jaffri*, 26 N.E.3d at 638. "The Supreme Court of Indiana has held that a breach of contract does not give rise to a [negligence] claim unless a legal duty independent of the contract has been violated." *Lake Ridge New Tech Schs.*, 353 F. Supp. 3d at 757 (citing *Greg Allen Constr. Co.*, 798 N.E.2d at 175). That is, "a party to a contract or its agent may be liable in tort to the other party for damages from negligence that would be actionable if there were no contract, but not otherwise." *Greg Allen Constr. Co.*, 798 N.E.2d at 175.

In this case, the Plaintiff's gross negligence claim argues that the Defendant acted negligently by failing to properly supervise Katherine Rodriguez, that, due to this negligence, the Plaintiff's products were not delivered, and that the Plaintiff suffered damages. In other words, the Plaintiff alleges that because the Defendant acted negligently the contract was breached. The Plaintiff cannot succeed on such a claim as it is merely a repackaged breach of contract claim. Moreover, the Plaintiff cannot rely on the delivery contract to establish that the Defendant owed it a duty, and the Plaintiff has not established the existence of some other duty. As such, the Plaintiff's gross negligence claim fails.

## C.    Respondeat Superior Claims

The Plaintiff, in Counts III, V, and VIII, also brings claims based on the theory of respondeat superior liability. "The doctrine of respondeat superior imposes liability on an employer for the wrongful acts of [its] employee committed within the scope of employment."

*Hurlow v. Managing Partners, Inc.*, 755 N.E.2d 1158, 1161 (Ind. Ct. App. 2001) (citing *Stropes v. Heritage House Childrens Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 247 (Ind. 1989)). Count III alleges that "Best Transportation is liable for the negligent acts of Katherine Rodriguez, as Katherine Rodriguez was acting within the course and scope of her employment at all relevant times herein," Count V alleges that "Best Transportation is liable for the fraudulent act of Katherine Rodriguez, as Katherine Rodriguez was acting within the course and scope of her employment during her fraudulent act," and Count VIII alleges that "Best Transportation is liable for the conversion of Katherine Rodriguez, as Katherine Rodriguez was acting within the scope of her employment during the conversion." Am Compl. ¶¶ 29, 46, 66.

Under the doctrine of respondeat superior, "a principal is not liable for the torts of [its] independent contractors." *Hixon v. Sherwin-Williams Co.*, 671 F.2d 1005, 1009 (7th Cir. 1982) (citing *Ryan v. Curran*, 64 Ind. 345, 354 (1878)); *see also Moberly v. Day*, 757 N.E.2d 1007, 1009 (Ind. 2001) (recognizing that Indiana has a "long-standing general rule . . . that a principal is not liable for the negligence of an independent contractor" (quoting *Bagley v. Insight Commc'ns Co.*, 658 N.E.2d 584, 586 (Ind. 1995))); *Ali v. All. Home Health Care*, LLC, 53 N.E.3d 420, 434 (Ind. Ct. App. 2016) ("We have long held that, subject to specific exceptions, a principal is not liable for the torts of independent contractors." (citing *Carie v. PSI Energy, Inc.*, 715 N.E.2d 853, 855 (Ind. 1999)). Indeed, "[a]n entity cannot be held liable under a theory of respondeat superior unless an employer-employee relationship exists between the entity and the person who caused the plaintiff's injuries." 12 Ind. Law Encyc. Employment § 125 (citing *Kahrs v. Conley*, 729 N.E.2d 191 (Ind. Ct. App. 2000)). Based on the evidence introduced at trial, the

Court finds that Katherine Rodriguez was an independent contractor; therefore, the Plaintiff's respondeat superior claims fail.[2]

"Generally, the question of whether one acts as an employee or an independent contractor is a question for the finder of fact." *Guillaume v. Hall Farms, Inc.*, 914 N.E.2d 784, 788 (Ind. Ct. App. 2009) (citing *Snell v. C.J. Jenkins Enters., Inc.*, 881 N.E.2d 1088, 1090 (Ind. Ct. App. 2008)). Under Indiana law, the following factors may be considered when determining whether an individual is an employee or an independent contractor:

    (a) the extent of control which, by the agreement, the master may exercise over the details of the work;

    (b) whether or not the one employed is engaged in a distinct occupation or business;

    (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

    (d) the skill required in the particular occupation;

    (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

    (f) the length of time for which the person is employed;

    (g) the method of payment, whether by the time or by the job;

    (h) whether or not the work is a part of the regular business of the employer;

    (i) whether or not the parties believe they are creating the relation of master and servant; and

---

[2] The Court recognizes that there exist exceptions to the general rule that employers cannot be held liable for the conduct of their independent contractors, including when one party is contractually charged with performing the specific duty. *Shawnee Constr. & Eng'g Inc. v. Stanley*, 962 N.E.2d 76, 81 (Ind. Ct. App. 2011) (citing *Merrill v. Knauf Fiber Glass GmbH*, 771 N.E.2d 1258, 1264 (Ind. Ct. App. 2002)). During trial the Plaintiff failed to show that the contracts at issue created a contractual duty of care. *See Marks v. N. Ind. Pub. Serv. Co.*, 954 N.E.2d 948, 952–54 (Ind. Ct. App. 2011). In fact, the evidence does not even demonstrate that the contracts expressly prohibited the Defendant from delegating its contractual obligations to an independent contractor. Therefore, the Court concludes that this exception does not apply.

(j) whether the principal is or is not in business.

*Moberly*, 757 N.E.2d at 1009–10 (quoting Restatement (Second) of Agency § 220 (1958); citing *Mortg. Consultants, Inc. v. Mahaney*, 655 N.E.2d 493, 495 (Ind. 1995)).

In this case, the Plaintiff provided insufficient evidence to establish that Katherine Rodriguez was an employee rather than an independent contractor. Of the above-listed factors, only (h) and (j) weigh in favor of the Plaintiff, as the evidence shows that the Defendant was in business and that the delivery services provided by Katherine Rodriguez were part of the Defendant's regular business.

Factors (a), (b), (e), (g), and (i) weigh in favor of the Defendant. Factor (a) requires the Court to consider the extent of control which, by the agreement, the Defendant could exercise over the details of Katherine Rodriguez's work. *Moberly*, 757 N.E.2d at 1010. The evidence demonstrates that the Defendant generally exerted little control over the details of the delivery persons' work. The Defendant allowed the delivery persons to accept whatever job they wanted as long as they met the necessary qualifications, and the Defendant provided training and instruction only based on the demands of its clients. Tr. v.2, p. 315–16, 324, 338, 340–42, 349–50. Nothing before the Court suggests that the Defendant's representatives accompanied its delivery persons to provide instruction or supervision. Although the Defendant could communicate with the drivers using its dispatch department, no evidence was introduced suggesting that the dispatch department was used to constantly monitor or supervise the delivery persons' work. Tr. v.1, p 34, 37, 47, 78–79, 84, 110; Tr. v.2, p. 338–39, 351–52. Rather, it appears that the Defendant primarily used its dispatch department to confirm that the delivery persons picked up and completed their deliveries. Tr. v.2, p. 338–39. It was also established that, despite the Defendant's software generating a route based on the client's orders, the delivery

12

persons were permitted to accept or deny the generated route. Tr. v.2, p. 359–60. Although the

Defendant could freely communicate with the drivers and some instruction was provided, the

evidence does not demonstrate the level of control necessary for the Court to conclude that the

delivery persons were employees of the Defendant. Furthermore, the Plaintiff introduced no

evidence indicating that Katherine Rodriguez received any training, instruction, or supervision

from the Defendant that would make it more likely that she was an employee. As such, factor (a)

weighs in favor of the Defendant.

Factor (b) also weighs in favor of Katherine Rodriguez being classified as an independent

contractor. Although no evidence was introduced to establish whether Katherine Rodriguez

exclusively worked for the Defendant, it is clear that the Defendant provided gig-based

employment for its delivery persons and that Katherine Rodriguez, like all other drivers, was

under no requirement to take any particular job and was free to work for other companies,

including the Defendant's competitors. Tr. v.2, p. 312–15, 340–42. Therefore, this factor weighs

in the Defendant's favor. *See Walker v. Martin*, 887 N.E.2d 125, 132 (Ind. Ct. App. 2008) ("The

evidence demonstrated that Martin was engaged in his own hauling business and did not work

exclusively for LaFountaine. Therefore, this factor also weighs in favor of Martin as an

independent contractor.").

Factor (e) relates to the equipment provided by the principal. In this case, the only

"equipment" the Defendant freely provided to its delivery persons was an identification badge.

Tr. v.2, p. 316. In contrast, the delivery persons were responsible for providing their own vehicle,

providing or leasing from the Defendant their own smartphone or handheld device, leasing from

the Defendant the necessary software, and providing or leasing (from a third party) their uniform.

(Tr. v.1, p. 108; Tr. v.2, p. 315, 317, 340–42, 361). Further, the Plaintiff did not show that

Katherine Rodriguez obtained any equipment from the Defendant. *See Carroll v. Kamps*, 795 F.

13

Supp. 2d 794, 808 (N.D. Ind. 2011) ("When a principal provides the instrumentalities of employment, particularly instrumentalities of substantial value, this factor tilts towards employee status." (citing *Moberly*, 757 N.E.2d at 1012)). Accordingly, this factor also weighs in the Defendant's favor.

Finally, factors (g) and (i), which, respectively, require the Court to consider how the worker was paid and whether the parties believe an employer-employee relationship was being created, also support the conclusion that Katherine Rodriguez was an independent contractor. The evidence clearly demonstrates that the delivery persons, including Katherine Rodriguez, were not paid directly by the Defendant; rather, the Defendant paid a staffing agency for the services performed by the delivery persons. Tr. v.2, p. 313–14, 346.[3] Additionally, the evidence shows that the Defendant's employees did not believe that the delivery persons, including Katherine Rodriguez, were company employees. Indeed, two of the Defendant's employees testified at trial that the delivery persons were independent contractors. Tr. v.1, p. 201; Tr. v.2, p. 306.[4]

The Court has been provided insufficient evidence to determine whether factors (c), (d), and (f) weigh in favor of Katherine Rodriguez being considered an employee or an independent contractor. Factor (c) requires the Court to consider the industry standard practice. While the Defendant's CEO testified that the use of independent contractors was standard in the delivery industry, Tr. v.2, p. 324, he did not testify as to whether the work performed in the industry is

---

[3] The Court notes that the Plaintiff's witness Denita Wuske testified that the Defendant paid Katherine Rodriguez. Tr v.1, p. 111. However, this testimony is discredited by Denita Wuske's later testimony that Katherine Rodriguez was not on the Defendant's payroll and Daniel Meehan's testimony that Katherine Rodriguez was not paid by the Defendant and that Denita Wuske, due to her position at the company, would not have any knowledge regarding the delivery persons' compensation. Tr v.1, p. 115 Tr. v.2, p. 312–14.

[4] There is no evidence before the Court indicating whether Katherine Rodriguez believed she was an employee or an independent contractor; therefore, this factor does not weigh heavily in the Court's analysis.

typically carried out under the direction of the employer or by a specialist without supervision. There was also limited evidence relating to factor (d), which requires the Court to consider the level of skill required to perform the work. While some evidence was presented indicating that the Defendant occasionally provided training to its delivery persons, *id.* at 315–16, 324, 338, 349–50, no evidence clearly addressed the level of skill needed to be a delivery person, *see Walker*, 877 N.E.2d at 132 (explaining that being an interstate truck driver with a commercial driver's license requires particularized skill, which favors the driver being considered an independent contractor); *but see Bauermeister v. Churchman*, 59 N.E.3d 969, 976 (Ind. Ct. App. 2016) ("Churchman's job was to deliver newspapers, 'which does not require special skill and weighs slightly in favor of [her] status as an employee.'" (quoting *Snell*, 881 N.E.2d at 1092)). Finally, no evidence addressing factor (f)—the length of time the worker was employed—was introduced, as no exhibit or witness testimony indicated how long Katherine Rodriguez worked as a delivery person for the Defendant.

The Court, having considered each of the above described factors in relation to the evidence presented by both parties, concludes that Katherine Rodriguez was an independent contractor. As such, the Plaintiff's respondeat superior claims fail.

## D.    Damages

The Plaintiff has established that the Defendant breached the contracts between them; therefore, the Court must determine the amount of damages that should be awarded. The Plaintiff represents that its damages from the breach of contract claim are $143,601.20 for the initial lost prescriptions, the remanufactured prescriptions, the delivery fee paid to the Defendant, the HIPAA notification costs, and the loss of future profits.

Under Indiana law, "a party injured by a breach of contract may recover the benefit of its bargain but is limited in its recovery to the loss actually suffered" and a "party injured by a

breach of contract may not be placed in a better position than it would have enjoyed if the breach had not occurred." *Otter Creek Trading Co. v. PCM Enviro PTY, LTD*, 60 N.E.3d 217, 229 (Ind. Ct. App. 2016) (citing *Fowler v. Campbell*, 612 N.E.2d 596, 603 (Ind. Ct. App. 1993)). "A damage award must be based upon some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits, or direct inference from known circumstances." *Id.* Furthermore, "[t]he measure of damages for breach of contract is limited by what is reasonably foreseeable at the time the parties entered into the contract," with foreseeable damages being only those damages for "which it is objectively reasonable to expect, not merely what might conceivably occur." *Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243, 249 (Ind. Ct. App. 2010) (citing *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000); *Greives v. Greenwood*, 550 N.E.2d 334, 338 (Ind. Ct. App. 1990)). "It is the plaintiff's burden to prove damages, and a damage award must be supported by probative evidence." *Id.* (citing *Ind. Bureau of Motor Vehicles v. Ash, Inc.*, 895 N.E.2d 359, 368 (Ind. Ct. App. 2008)).

The breakdown of the Plaintiff's claim for damages is as follows: $27,780.94 for the destruction of the initial prescriptions given to Katherine Rodriguez for delivery on July 17, 2015; $27,780.94 for the remanufacture of the destroyed prescriptions; $126.56 for delivery fees paid to the Defendant; $53.92 for notices required under HIPAA; and $87,858.84 for the loss of future profits because certain prescriptions were not refilled following the July 17, 2015 incident. The Court considers each source of damages in turn.

## 1.    *Damages for the Initial Prescriptions*

If the Defendant had delivered the Plaintiff's prescriptions, the Plaintiff would have been compensated by various medical insurance providers. As such, the Plaintiff would typically be entitled to damages in the amount it would have received for the products. Restatement (Second)

of Contracts § 347 cmt. a (1981) ("Contract damages are ordinarily based on the injured party's

expectation interest and are intended to give him the benefit of his bargain by awarding him a

sum of money that will, to the extent possible, put him in as good a position as he would have

been in had the contract been performed."). However, in this case, the Plaintiff's damages are

limited because of the Defendant's terms and conditions of service and because such an amount

was not foreseeable to the Defendant.

Throughout trial, a key issue was whether the Defendant required its customers to submit

the value of the items for which they sought delivery services. The evidence before the Court

clearly establishes that it was an industry standard to require the disclosure of a product's value

before shipment. Tr. v.1, p. 64; Tr. v.2, p. 287, 299–300, 306–11, 334. The evidence also shows

that it was the Defendant's practice to require its customers to disclose whether the item being

shipped had a value higher than $100.00. This requirement was included in the Defendant's

terms and conditions of services, which were printed on the Defendant's standard forms. Tr. v.2,

p. 265, 269–70, 276; Tr. Exs. A, B. The terms and conditions of services also released and

discharged "[a]ny claim in excess of the said $100.00." Tr. Exs. A, B. Such releases are

generally enforceable, *see Dick Corp. v. Geiger*, 783 N.E.2d 368, 373 (Ind. Ct. App. 2003)

("There is a very strong presumption of enforceability of contracts representing the freely

bargained agreement of the parties." (citing *Zollman v. Geneva Leasing Assoc's, Inc.*, 780 N.E.2d

387, 391 (Ind. Ct. App. 2002))); Restatement (Second) of Contracts § 346 cmt. a (1981) ("A duty

to pay damages may be suspended or discharged by agreement or otherwise, and if it is

discharged the claim for damages is extinguished."), and nothing before the Court suggests that

the release contained in the Defendant's terms and conditions of service should not be enforced.

The terms and conditions of service would have been seen by the Plaintiff during the course of

the parties' business relationship, and accepting the terms and conditions of service was a

prerequisite for submitting orders on the Defendant's online portal. Tr. v.2, p. 265, 269–70, 276; Tr. Exs. A, B.

Pursuant to the conditions agreed to by both parties, the Plaintiff's recovery for each lost package is limited to $100.00 per package. *See Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016); *Jallali v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.*, 908 N.E.2d 1168, 1173–74 (Ind. Ct. App. 2009). The Plaintiff argues that there is no evidence demonstrating that it was bound by the Defendant's terms and conditions of service, which includes the release and discharge of any claim in excess of $100.00. During trial it was established that customers who wished to use the Defendant's online portal were required to accept the Defendant's terms and conditions when registering an account. It was also established that the Plaintiff placed each of the orders at issue by using the online portal. Based on this process, it would seem that the Plaintiff was aware of and accepted the terms and conditions. The Plaintiff, however, argues the Plaintiff's account "was set up by a sales representative from Best Transportation; and therefore, Apex did not see those terms and conditions. Apex did not check a box affirming to have read, understood, or agreed to those terms and conditions;" therefore, it cannot be limited to a recovery of $100.00 per agreement. Tr. v.2, p. 386–87, 416.

Benjamin Kuehl testified that, when registering an online account, the registration page contained a link to the terms and conditions under which the Defendant provided services and that the registration page required the user to click a box indicating that the user agreed to be bound to the terms and conditions of service before being permitted to create an account to place online orders. *Id.* at 277, 295. He also testified that sales representatives could set up customer accounts, thus creating the possibility that a customer could have an account without previously checking the box indicating that the customer agreed to be bound to the Defendant's terms and conditions. *Id.* at 277–79, 295.

18

The evidence before the Court clearly demonstrates that the Plaintiff had an account; however, the Plaintiff failed to present sufficient evidence to support its contention that the Defendant's sales representative set up the Plaintiff's account in such a way that the Plaintiff was not aware of the Defendant's terms and conditions of service. To the contrary, Daniel Meehan testified that the sales representative would not register customers in the manner described by the Plaintiff; rather, the sales representative would "have to sit there and explain [the terms] to them" while the sales representative walked the customer through the registration process. *Id.* at 380–81. Although Benjamin Kuehl testified that a sales representative *could* set up a customer's account for them, he clarified that did not know what process the Plaintiff went through to create its account. *Id.* at 296.

During trial limited evidence was presented regarding the account registration process. Cassi Hammar testified that "Denita Wuske came in. She helped set up all the online accounts for their web portal for inputting the addresses for the patients and setting up—well, mostly explaining how it would work," but she did not describe the extent to which Denita Wuske "helped set up the online accounts" and did not testify that Denita Wuske, and not an Apex employee, completed the registration process.[5] Tr v.1, p. 25–26, 31. Additionally, the Plaintiff did not elicit testimony from Denita Wuske about the account registration process, despite its contention that she set up the account without having the Plaintiff review and accept the terms and conditions. Moreover, at no time did she testify that she acted in the manner described by the Plaintiff. Accordingly, the Court concludes that the Plaintiff's submission of orders from the

---

[5] While the Court recognizes that Cassi Hammar testified that there were no "clickwrap agreements" that required her to check a box to indicate that she read and accepted the Defendant's terms and conditions of service; it is clear that she was describing the submission of order forms and not the initial registration process. Tr v.1, p. 31.

online portal demonstrates that the Plaintiff agreed to be bound by the Defendant's terms and conditions of service, including the release and discharge of any claim in excess of $100.00.

Even if the condition releasing and discharging claims in excess of $100 is inapplicable, the Plaintiff's recovery would still be limited to the damages reasonably foreseeable to the Defendant. The Plaintiff affirmatively represented that six packages were valued at $100.00 and provided no valuation for the remaining two packages. No evidence suggests that any value above $100.00 was ever declared by the Plaintiff; rather, the Plaintiff's position that such a declaration was not required suggests that the Plaintiff never declared a value greater than $100.00. Based on the affirmative representations made by the Plaintiff, the Defendant could reasonably foresee that losing the packages would result in a loss of $800.00; therefore, the Plaintiff's damages are limited to that amount.

## 2.   *Damages for the Remanufactured Prescriptions*

The Plaintiff also seeks $27,780.94 for the remanufacture of the eight prescriptions because, according to Brett Dines's testimony, the Plaintiff was not compensated for the remanufactured prescriptions. Tr. v.1, p. 224–26. Brett Dines testified that the Plaintiff did not submit a compensation form to its customer's medical insurance providers for the remanufactured prescriptions because to do so would be "contrary to industry norms." *Id.* Specifically, he testified:

> We failed to make the delivery in a timely manner. The medication was for pain medication. The patient suffered throughout the entire weekend and going into Tuesday; and as a result of that, I believe not only the insurance carriers would have rejected the claim, but the referral base would have been up in arms too about us charging for their medications when we didn't even deliver it on time.

*Id.* at 226. It is clear that awarding damages for the remanufacture of the prescriptions would be improper for three reasons.

20

First, as previously explained, by agreeing to the Defendant's terms and conditions of service, the Plaintiff released and discharged any claims in excess of $100.00 for each contract. The Court has already determined that the Plaintiff should be awarded $800.00 in damages; therefore, the Plaintiff cannot recover additional damages.

Second, Brett Dines's testimony does not demonstrate that these damages flowed directly and naturally from the Defendant's breach of contract. *See Sammons Commc'ns of Ind., Inc. v. Larco Cable Constr.*, 691 N.E.2d 496, 498 (Ind. Ct. App. 1998) ("To recover the plaintiff must show that its damages flowed directly and naturally from the breach." (citing *Colonial Discount Corp. v. Berkhardt*, 435 N.E.2d 65, 66 (Ind. Ct. App. 1982))). Rather, his testimony suggests that the Plaintiff may not have been compensated for the remanufacture of the lost prescriptions solely because the Plaintiff voluntarily declined to seek payment from its customer's medical insurance providers. As there is insufficient evidence for the Court to conclude whether the damages were the result of the Defendant's breach of contracts or the Plaintiff's failure to seek compensation, an award cannot be granted.

Third, the Plaintiff's damages, as previously explained, are limited to the damages that were reasonably foreseeable at the time the parties entered into the contract. There is no evidence before the Court demonstrating that the Plaintiff informed the Defendant, or that it should have been otherwise foreseeable, that if the prescriptions were lost, the Plaintiff would still be required to deliver the medication and would decline to seek or be ineligible to receive compensation for the remanufactured prescriptions. As such, the damages requested by the Plaintiff in the form of $27,780.94 for the remanufacture of the eight prescriptions were not reasonably foreseeable to the Defendant and cannot be recovered.

3.      *Refund of Delivery Fees*

The Plaintiff also requests $126.56 in damages as a refund for the fees it paid to the

Defendant for its delivery services on July 17, 2015. Generally,

> damages are designed to [protect] one or more interests of the non-breaching party:
>
> (a) His "expectation interests" which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed;
>
> (b) His "reliance interests" which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been had the contract not been made; or
>
> (c) His "restitution interest" which is his interest in having restored to him any benefit that he has conferred on the other party.

*Lincoln Nat. Life Ins. Co. v. NCR Corp.*, 603 F. Supp 1393, 1405 (N.D. Ind. 1984) (quoting

Restatement (Second) of Contracts § 344 (1981)). The refund requested by the Plaintiff is a form

of damages based on the Plaintiff's "restitution interest." *See id.*

"Ordinarily, when a court concludes that there has been a breach of contract, it enforces

the broken promise by protecting the expectation that the injured party had when he made the

contract." Restatement (Second) of Contracts § 344; *see also Otter Creek Trading Co.*, 60

N.E.3d at 229 ("It is axiomatic that a party injured by a breach of contract may recover the

benefit of its bargain . . . ."); Restatement (Second) of Contracts § 373 cmt. a ("An injured party

usually seeks, through protection of either his expectation or his reliance interest, to enforce the

other party's broken promise."). "But expectation damages are not the sole remedy for breach of

contract. Occasionally, the aggrieved party's interest is protected by an award of restitution

damages, 'measured by determining the reasonable value of the benefits conferred upon and

received by the defendant, rather than by the detriment undergone by the plaintiff in reliance on

the contract or the losses sustained by the plaintiff.'" *Agrigenetics, Inc. v. Pioneer Hi-Bred Int'l.,*

*Inc.*, No. 1:08–cv–802, 2010 WL 4683936, at *2 (S.D. Ind. 2010) (quoting 24 Richard A. Lord, *Willison on Contracts* § 64:1 (4th ed. 2001)); *see also* Restatement (Second) of Contracts § 373 cmt. a. ("However, [the nonbreaching party] may, as an alternative, seek, through protection of [their] restitution interest, to prevent the unjust enrichment of the other party.")

In this instance, an award of restitution damages would be inappropriate. Such damages are typically sought and awarded when the underlying agreement is not enforceable, when it will result in a larger recovery, and/or when proving expectation damages is difficult or impossible. *See* Restatement (Third) of Restitution and Unjust Enrichment § 38 cmt. a (2011); Restatement (Second) of Contracts § 344 cmt. a. No such issue is present in this matter. The Court has already determined that there was a breach of eight contracts. The Court, by considering the value of the shipped goods, the amount of payment the Plaintiff expected, and the terms of the agreements, determined that the benefit of the Plaintiff's bargain is $800.00. Finally, an award of $800.00 is greater than the $126.56 requested as a refund. Accordingly, the Plaintiff's request for $126.56 of damages as a refund is not supported by law. Furthermore, such an award would be contrary to the terms of the contracts, which do not provide for a refund and limit the Plaintiff's recovery to $100.00 per agreement. *See* Restatement (Third) of Restitution and Unjust Enrichment § 38 cmt. c ("Performance-based damages, like expectation damages, respect the price terms and the risk allocations established by the parties' agreement."). Therefore, the $126.56 in damages as a refund for the delivery fees cannot be recovered.

### 4.       *Damages for the HIPAA Notices*

As a result of the Defendant breaching the contract, the prescription medications the Plaintiff was shipping were lost. To comply with the Plaintiff's HIPAA obligations, the Plaintiff was required to send notifications regarding the lost prescriptions to its customers. *See* 45 CFR § 164.404. Sending the notifications cost $53.92, which the Plaintiff seeks in damages from the

Defendant. While the Court agrees that these damages would have been foreseeable to the Defendant because it was aware that the products being shipped were prescription medications, the damages the Plaintiff can recover are limited by the release contained in the Defendant's terms and conditions of service. Therefore, this amount cannot be recovered.

**5.      *Damages for the Loss of Future Profits***

Finally, the Court cannot award the requested $87,858.84 for the loss of future profits. The Court cannot make such an award because, as explained above, the damages the Plaintiff can recover are limited by the release contained in the Defendant's terms and conditions of service. However, an award of damages for the loss of future profits would also be improper because no evidence was introduced establishing the future profits to be reasonably certain or that the loss of future profits flowed directly and naturally from the breach of contracts.

Although a Plaintiff may recover lost profits, "an award of damages for lost profits cannot be based upon mere conjecture or speculation," and "[i]t is wholly improper . . . for a trier of fact to project past profits indefinitely into the future without evidence that the projection was at least reasonably certain." *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1043 (Ind. Ct. App. 2012) (citing *Belle City Amusements, Inc.*, 936 N.E.2d at 250; *T & W Bldg. Co. v. Merrillville Sport & Fitness, Inc.*, 529 N.E.2d 865, 868 (Ind. Ct. App. 1988)). The only evidence the Plaintiff presented to show that the future profits were reasonably certain was Brett Dines's testimony that the company had an 85% refill rate on its prescriptions. Tr. v.1, p. 166. This testimony alone is insufficient for the Court to conclude that the future profits were reasonably certain.

Further, a plaintiff can only recover future profits if the loss of such profits flowed directly and naturally from the breach of contracts. *See Sammons Commc'ns of Ind., Inc.*, 691 N.E.2d at 498. Brett Dines testified that the Plaintiff followed up with each physician or office

24

manager who did not order refills and was informed that the refills were not ordered "predominantly" because the Plaintiff "didn't have the customer service level that was necessary to meet the needs of their patients." Tr. v.1, p. 191–92. This testimony is vague, as it does not specify that the refills were not ordered because of the July 17, 2015 incident. It is possible that there were issues with the Plaintiff's customer service outside of the Defendant's failure to timely deliver the medication. *See id.* at 18–19. Furthermore, no witnesses, such as patients or providers, were called to corroborate Brett Dines's testimony or to explain that typically refills would be ordered but were not ordered due to the July 17, 2015 incident. Refills may not have been ordered for a multitude of reasons. For example, a patient could have passed away or a provider may have determined that a different medication was more suitable for their patient's needs. As the Plaintiff has not demonstrated that the future profits were relatively certain or that the loss of future profits was the natural consequence of the breach of contract, an award of $87,858.84 for the loss of future profits would be improper.

### 6.      *Other Requested Damages*

In addition to the $143,601.20 described above, the Plaintiff also seeks $460,530.44 in damages for the loss of company value. However, this amount was sought only in relation to the Plaintiff's negligence claims. Tr. v.1, p. 196–99. The Plaintiff did not succeed on its negligence claims and, therefore, cannot recover this amount. Finally, the Plaintiff sought an award of punitive damages; however, "[i]t is well settled that a breach of contract claim may not lead to an award of punitive damages." *Sheaff Brock Inv. Advisors, LLC v. Morton*, 7 N.E.3d 278, 288 (Ind. Ct. App. 2014) (citing *Tobin*, 819 N.E.2d at 86). As the Plaintiff only succeeded on its breach of contract claim, punitive damages cannot be awarded.

25

**CONCLUSION**

For the reasons stated above, the Court finds that the Plaintiff is entitled to a verdict in its favor as to Count VI only and to an award of damages in the amount of $800.00. The Court DIRECTS the Clerk of Court to ENTER JUDGMENT in favor of the Plaintiff Apex Compounding Pharmacy LLC and against the Defendant Best Transportation Services, Inc. in the amount of $800.00.

SO ORDERED on March 18, 2021.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT